## IN RE BUNSTON.

(No. 3,746.)

(Submitted January 31, 1916.   Decided February 25, 1916.)

[155 Pac. 1109.]

*Attorneys—Professional Misconduct—Disbarment.*

1.  A county attorney who used the powers of his office, by issuing
warrants for the arrest of persons and filing informations against
others, to compel them to make monetary settlements favorable to
clients in his civil practice, was guilty of such misconduct as to
warrant his disbarment.

[As to unprofessional conduct as ground for disbarment of attor-
ney, see note in 45 Am. St. Rep. 81.]

PROCEEDINGS for the disbarment of H. W. Bunston.   Accused
disbarred, with leave to apply for reinstatement after one year
upon condition.

*Mr. E. E. Lonabaugh,* of the Bar of Wyoming, for Accused.

MR. JUSTICE SANNER delivered the opinion of the court.

Charges having been filed against H. W. Bunston, a member
of the Bar of this state, alleging professional misconduct in cer-
tain particulars, Honorable F. B. Reynolds, of Billings, was ap-
pointed commissioner of this court to hear the testimony and
report the same, together with his findings of fact and con-
clusions of law.   This has been done, and the substance of his

As to disbarment or suspension of attorney for misconduct in an
official capacity other than his attorneyship itself, see note in L. R. A.
1915A, 663.

findings, so far as we deem them material and supported by the evidence, is as follows:

(1) That the respondent is thirty years of age, possesses a university education, resides and practices his profession at Hardin, and since January 4, 1915, has been county attorney of Big Horn county.

(2) That William Flannery, claiming to have purchased from the Chicago, Burlington & Quincy Railroad Company certain ties, posts and wire, left by said company upon its abandoned line between Toluca Junction and Pryor Agency, employed respondent as his attorney to make collection of claims from various parties, including one C. B. Clark and wife, for the taking of portions of such ties, posts and wire, and three days after such employment the respondent prepared a criminal complaint and caused the arrest of said Clarks for receiving stolen property, to wit, a portion of said ties, posts and wire. Upon this complaint the Clarks were given a preliminary hearing, and on April 13, 1915, held to answer to the district court of Big Horn county. On May 12, 1915, the respondent called upon said Clarks for the purpose of procuring a settlement of Flannery's claim; but they, disputing Flannery's title to the property, offered to submit to a civil suit upon the claim and to give bond for the payment of any judgment that might be awarded against them. The respondent insisted on payment without civil suit and stated to C. B. Clark that, if such settlement was not made, the criminal proceeding would not be dismissed; whereupon and to avoid the filing of an information against himself and his wife, and understanding from respondent's statement that the criminal charge would be dismissed if the settlement were made, said Clark gave the respondent a check for $160, saying that he would rather pay than submit to the criminal action; respondent took the check, cashed it, retained for himself $40 as a fee, reserved for his associate counsel a like amount as a fee, and deposited in bank the sum of $80 for Flannery. The respondent filed no information against the Clarks, or either of them, but on May 18, 1915, did file with the clerk of the district court of

Big Horn county a statement of his reasons for not further prosecuting said charge.    Thereafter C. B. Clark demanded the return of the money so paid by him to respondent, on the ground that the same had been obtained through duress, but the respondent refused to make such return, although Flannery had not then approved the settlement or accepted the fruits thereof.

(3) That on April 15, 1915, in consequence of a difficulty at Wyola between the wife of one S. L. Young and a certain Miss Shaw, Mrs. Young by mistake threatened a Miss Pickering with a gun, supposing her to be Miss Shaw, causing the physical collapse of Miss Pickering as well as nervous shock to Mrs. Young. One Dr. Ashby, a woman physician, rendered assistance to both and later complained to respondent that S. L. Young had refused to pay her claim for such services; whereupon the respondent, though he knew and understood that S. L. Young had been guilty of no criminal act and was not liable to Dr. Ashby for any services rendered to Miss Pickering, wrote two letters to said S. L. Young on the letter-head of the county attorney's office, demanding that Dr. Ashby's claim be settled, in one of which he stated: "If a satisfactory reply is not received, together with a remittance for the claim made, you may expect criminal proceedings to be entered against you at once."    And in the other of which he said: "The refusal on your part to pay the claim of Dr. Ashby was the straw that broke the camel's back, and unless it is straightened up    *    *    *    you will have to face the music; if it is, I feel that you will have no particular cause to worry."

(4) That prior to July 29, 1915, one Carl Messing was a tenant of one D. S. Kearney.    Difficulty arose between them, as a result of which Kearney threatened to kill Messing, and respondent as county attorney was asked to institute proceedings against Kearney to compel him to keep the peace.    On July 29, the respondent went to Kearney's home accompanied by a deputy sheriff, to whom he had given what purported to be, and on its face was, a valid warrant for the arrest of Kearney and there sought to secure an adjustment of the Messing affair. The negotiations not proceeding to his satisfaction, he instructed

the deputy out of Kearney's hearing to put Kearney under arrest. This, however, was not done; Kearney agreeing to give Messing a promissory note for $190 secured by chattel mortgage. Thereafter respondent returned to Hardin, prepared and sent to Kearney for execution the chattel mortgage referred to. Said mortgage was returned to respondent who, out of the presence of Kearney and without any acknowledgment by Kearney of the execution of the same, certified as a notary public that said Kearney acknowledged before him the execution of said mortgage, and at the same time respondent himself made the affidavit of good faith required of the mortgagee, as agent of Messing.

(5) That it has been, and at the time of the Kearney matter was, the custom of respondent as county attorney to keep in his office blank warrants signed by the justice of the peace, and blank complaints with the signature of the justice of the peace to the affidavit thereto, so that, in the discretion of the respondent, he could fill in a complaint and warrant above the signatures and have the warrant served by the sheriff without the necessity of calling upon a justice of the peace to take action in the particular case. The warrant given to the deputy by respondent in the Kearney matter was of this character, no complaint whatever having been filed.

(6) That on September 29, 1915, respondent, as attorney for one Walsh, procured a judgment against one Edwards for about $1,100, and shortly thereafter told Edwards that, if the judgment was not promptly paid, "other proceedings" would be instituted. Thereafter, on October 14, said judgment not having been paid, respondent, as county attorney, brought criminal action against Edwards, charging him with obtaining money by false pretenses. Upon this charge a preliminary examination was had, and Edwards was held to answer and committed to jail for want of bail. Thereafter, on November 4, 1915, Edwards was discharged from such commitment by the district court of Yellowstone county on *habeas corpus*. Meanwhile, respondent, anticipating the possible discharge of Edwards, prepared and

verified a second complaint charging Edwards with larceny as bailee, and, without such complaint being filed in any court, delivered a warrant of arrest to the sheriff, who immediately, upon the discharge of Edwards, served the same by taking Edwards into custody. Thereafter the complaint was filed in the justice court, but respondent had never any intention to prosecute said charge or to file said complaint, unless Edwards should be discharged on the *habeas corpus* proceedings above referred to.

The conclusions of the commissioner are that in the Kearney and Edwards transactions there was no professional misconduct on the part of respondent "except his use of blank complaints and warrants" and his certifying to the acknowledgment by Kearney of the chattel mortgage; that in the Clark transaction respondent was guilty of a violation of Code section 6402, of extortion as defined by Code sections 8663 and 8664, of malpractice involving moral turpitude, and of unprofessional conduct; that in the Young transaction respondent was guilty of blackmail as defined by Code section 8671, of malpractice involving moral turpitude, and of unprofessional conduct. The contention of respondent is that these conclusions are not warranted by the findings, and that the findings do not impute to him any culpable act.

We deem it unnecessary to say whether the conduct of respondent as exhibited by this record amounts to violations of the sections above referred to, or of other sections that may readily occur to the mind, since we have no sort of doubt that it was malpractice of the most serious character. Touching the Clark matter, there was evidence to show not only the naked facts found by the commissioner, but also that when Clark disputed Flannery's title to the property he also claimed to have taken it by permission of its custodian; that, when he invited a civil suit to settle the matter, respondent said he had been over the title business and had no doubt of Flannery's right, called attention to the fact that the time for filing the information would expire the following day, stated that after such filing

the matter would be harder for him to dismiss because it would have to be done in court, mentioned that, unless a settlement was tendered, the information would be filed, and asked Clark if he was willing to tender a settlement in case the information should not be filed; and that, among the reasons stated by the respondent to the court for not filing an information, were doubt of Flannery's title to the property, and respondent's belief that there was no intent to steal on the part of the Clarks. As avoiding the imputation of wrongdoing, the respondent suggests that there was no threat to accuse, because the Clarks had already been accused, and that they had paid no more than the just value of the property. We cannot admit the force of these propositions. An information by a county attorney charging the commission of an offense is as much an accusation as a complaint. The power vested in him and the duty imposed upon him, to file, or, in certain circumstances, not to file, an information after commitment by a magistrate, are the power and duty to accuse or not to accuse; it is the right of the state and of every person within the state to have that power exercised and that duty performed in every instance without price, and that right applied to the case of the Clarks, without regard to whether they did or did not pay for the property. So, too, the amount paid is not the point. Conceding the amount was just, it does not follow that it was justly due to Flannery, or that the Clarks could be justly deprived of their right to dispute his title and protect themselves from other possible claims. If, for the reasons stated to the court by the respondent himself, his duty was not to file an information, he could not lawfully file one in order to extract money from the Clarks to pay Flannery, whose right thereto was disputed and, in his own language, open to doubt.

For the Young letters, not the shadow of an excuse is offered. Yet they were a deliberate threat by the respondent to exercise his power as county attorney to prosecute for crime a man confessedly innocent of crime unless that man should pay a civil claim none of which he had personally incurred and for a portion of which he was not even liable. A thing of this sort would

not have been permitted in the days of old when men were jailed for debt; the unfortunate was always given a chance to dispute the debt, and, if he was found to owe and could not pay it, he was branded as a debtor, but not as a criminal. The passage of those days is a matter of history, and a university graduate with capacity sufficient to become an attorney at law cannot plead ignorance of a matter of such elementary and universal knowledge as that civil claims can be enforced only by civil means.

The plea of exoneration, based on the belief of the commissioner that in the Clark and Young transactions the respondent did not deliberately intend to do wrong, and did not seek to profit by the Young affair, cannot be entertained. That he intended to do just what he did do is unquestioned, and it is too late in the twentieth century to say that such conduct, exhibiting, as it does, an utter indifference to the solemn responsibilities reposed in a prosecuting officer, and invading, as it does, the most sacred rights of the citizen, involves no moral obliquity, whether or not the respondent profited or sought to profit thereby.

With the disposition exhibited in the Clark and Young matters to use the power of the county attorney in furtherance of objects in no wise connected with the duties of that office, the course of procedure adopted in the Edwards matter seems entirely consistent. The commissioner has found, however, that the "further proceedings" threatened in that matter were an equity suit. As there is some evidence to warrant this view, we shall not include the Edwards matter as a basis for respondent's condemnation; save as regards the habit of keeping and issuing warrants at his pleasure, without the existence of sworn complaints duly filed to authorize them.

Not only do these modern *"lettres de cachet"* also appear in the Kearney matter, but that matter presents two other improprieties, *viz.*, respondent's certificate as a notary public to the effect that Kearney had appeared and acknowledged the execution of the chattel mortgage to Messing, when such was not the

fact, and his affidavit to the good faith of the mortgage as agent for Messing, when his authority to make it was doubtful, to say the least. We mention these in passing, for, though not embraced within the charge as filed against respondent, they form the subject matter of a finding by the commissioner to which no exception has been taken, and illustrate what the commissioner calls the respondent's "lack of a clear perception of the moral and professional obligations resting upon him as a member of the Bar of this state."

It is our opinion that attorneys so afflicted are not to be trusted with the serious and important duties which it falls to the profession to perform, but should in all cases be accorded an opportunity to acquire the requisite perception. It is therefore ordered that respondent's name be stricken from the roll of attorneys of this state, and that he be debarred from practicing law directly or indirectly; with leave, however, to apply for reinstatement after one year, upon showing to the satisfaction of this court that he has acquired a due appreciation of the moral and professional obligations resting upon members of the Bar.

Mr. Chief Justice Brantly and Mr. Justice Holloway concur.